# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| WILLIAM E. ALTON | * | |
| Plaintiff | * | |
| v | * | Civil Action No. WMN-10-2365 |
| CORRECTIONAL MEDICAL SERVICES, et al. | * | |
| Defendants | * | |

***

## MEMORANDUM

Pending in the above-captioned civil rights case are Defendants' Motions to Dismiss or in the alternative for Summary Judgment. ECF No. 18, 29, and 31. Plaintiff opposes the motions. ECF No. 33 and 35. Also pending is Defendant Wexford's Motion to Strike Plaintiff's Surreply. ECF No. 38. Upon review of the papers filed, the court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2010).

## Background

Plaintiff, a disabled inmate who suffers from Brown Sequard Syndrome (BSS),[1] alleges that he has been denied proper medical care for severe lower back pain stemming from a fall; gallstones; prostatitis; and nerve pain. ECF No. 1. Plaintiff's disability limits his mobility and requires the use of leg braces and "Canadian crutches"[2] or a wheelchair. He claims that in March and April of 2008, while he was confined at Eastern Correctional Institution (ECI), he was evaluated by Dr. David Mathis, who concluded that all of his medical issues were either not

---

[1] Brown-Sequard syndrome is a rare neurological condition characterized by a lesion on the spinal cord which results in weakness or paralysis (hemiparaplegia) on one side of the body and a loss of sensation (hemianesthesia) on the opposite side, characterized by a motor deficit and numbness to touch and vibration on the same side as the spinal injury, and loss of pain and temperature sensation on the opposite side. *See Alton v. Maryland Department of Public Safety*, Civ. Action WMN-10-1812 (D. Md.) at ECF No. 30 at p. 1, fn. 1.

[2] Canadian crutches consist of a single metal leg with an arm cuff and handgrip, used by placing the arm into the cuff and holding the handgrip. ECF No. 29 at Ex. A, p. 3, fn. 3.

serious or psychosomatic.  *Id*. at p. 5.  Plaintiff claims this evaluation was based on misleading information in his medical record, but does not specify what the record states.

On March 7, 2008, Physician's Assistant (PA) Bruce Ford performed a rectal exam on Plaintiff and noted fecal blood along with complaints of non-specific back pain.  Plaintiff claims despite the results of this examination and his complaints that he experiences occasional profuse rectal bleeding as well as mucous in his stools, medical staff has denied there was a problem and refused to provide any further tests.  ECF No. 1 at p. 5.

On June 11, 2008, Plaintiff was transferred from ECI to Western Correctional Institution (WCI) and claims his medical problems worsened after he fell, injuring his back. He claims his posture and stability began to deteriorate and he developed sciatic nerve pain, requiring him to rely more on the use of a wheelchair to move.  ECF No. 1 at p. 5.  Due to the decrease of Plaintiff's stability, he fell when he was in a shower stall on July 27, 2008,  leaving him unable to walk for approximately one month.  After his injury he was provided with a wheelchair for "long distances only" and was encouraged to continue using crutches and leg braces to walk and to exercise.  *Id*.  By October 24, 2008, Plaintiff claims he had not received the wheelchair and filed a complaint about the delay.  In addition, he asked for a test to determine the extent of injury to his hip and lower back.  ECF No. 1 at p. 6.  He claims he filed an Administrative Remedy Procedure complaint (ARP) on October 28, 2008, because he believed correctional staff were blocking or delaying the use of the prescribed wheelchair.  Plaintiff further alleges that his work supervisor, Lance Harbaugh wanted him to have access to a wheelchair to use as an option while working.[3]  Plaintiff received the wheelchair on November 13, 2008.  *Id*.

---

[3] *See Alton v. Md. Dept. of Public Safety & Correctional Services*, Civ. Action WMN-10-1812 (D. Md.).

Plaintiff claims on January 8, 2010, he filed an ARP against transportation officers because they forced him to wear retraints which were forbidden by a long-standing medical order during a court trip. The officers required Plaintiff to wear a heavy waistchain, shackles and handcuffs which restricted his already problematic gait and aggravated his lower back injury. He claims after the incident he was unable to stand or walk without the assistance of another inmate and the use of crutches. ECF No. 1 at pp. 6—7. During transport, Plaintiff was confined at Maryland Correctional Institution – Hagerstown (MCIH) where he claims he was denied pain medications for two days. *Id*.

On January 26, 2010, new medical orders were written by Dr. Hubert Mickels. The orders specified that when Plaintiff is transported he should not be required to wear shackles, handcuffs or a heavy waist chain until after he is seated in the van. ECF No. 1, p. 7. Plaintiff states the new order was the same as an old order which he claims was suddenly changed in order to retaliate against him. Plaintiff alleges that the medical order regarding restraints during transport was given to Sergeant Femi, who contacted Lt. Bennett and Major Thomas, who "coerced Isais Tessema to block, later change, and then deny that he wrote new orders." *Id*. at p. 7.

On April 29, 2010, Plaintiff was transferred to Roxbury Correctional Instituion (RCI) where he was diagnosed with benign prostatitis and an enlarged prostate. He was prescribed antibiotics for the prostatitis and claims injections for treatment of his sciatic nerve pain were also prescribed. ECF No. 1 at p. 8. Plaintiff further alleges that all other medications, Neurontin for pain, Prilosec (omeprazole) for gastrointestinal disorders, and lactulose along with a new pair of crutches, were ordered between the dates of May 12, 2010 and August 4, 2010. ECF No. 1 at p. 8. Plaintiff was, however, transferred to ECI on August 6, 2010, and all of the medicines

given to Plaintiff by staff at RCI were taken away from him. *Id* at p. 9. He further states that the prescription written for Neurontin required three doses a day, but was reduced to two doses based on "institutional policy." *Id*.

Plaintiff claims that while confined at ECI the pill call nurses regularly put his Neurontin dose into a cup of "contaminated water." He states the coating on the pill dissolved making it slimy and impossible to swallow. He further states the pills would get stuck to the bottom of the cup. Whenever he complained about the practice, he was told to throw the medication away and go without the medication that day. Plaintiff further claims there was no reason for restricting his access to his medication since he has never been charged with hoarding pills. He alleges he is simply being punished for the actions of other inmates. ECF No. 1 at p. 9. On August 17, 2010, Plaintiff states he was provided with only one pill when he should have been given two. When he complained he was told the error could not be corrected and was due to the warden's cost-containment, scheduling, and staff shortages during lock-downs. ECF No. 1 at p. 10.

Plaintiff states the injections for his sciatic nerve pain were supposed to take place on August 7 through 9, 2010, but he never received them. He claims the medical providers at ECI intentionally allowed the prescriptions written by PA McDonald to expire and claims there was no on-site medical professional or physician available to administer the injections. On August 24, 2010, Plaintiff states he met with Dr. Mathis, who told him he would have to re-order the injections or schedule an outside consultation. Plaintiff claims Mathis then left the room to discuss the issue of Plaintiff's prescription for Neurontin with the nursing staff. Plaintiff's prescription was then changed from a "keep on person" (KOP) prescription to a "watch take;" to comply with ECI policy. Plaintiff states he did not receive the injections prescribed by

McDonald because Mathis declined to order the required outside consultation and told Plaintiff he had been misled by medical staff at RCI. ECF No. 1 at p. 10.

In his amended complaint Plaintiff alleges that Melissa Crump "drowned [his] medications in a dirty cup of water and refused to retrieve them from the bottom of the cup" after Plaintiff showed her that the tablets were stuck to the bottom, slimy and "unfit for consumption." ECF No. 17 at p. 4. Plaintiff claims Crump refused to give him new tablets from the blister pack and yelled at him to throw the cup away. Officer Buck then intervened and told Plaintiff to throw away the cup with the tablets still stuck to the bottom. On October 24, 2010, after drinking "from a cup containing drowned pills" Plaintiff states he vomited and tried to explain that he could not continue to take his medication in this way. Plaintiff states that from October 12, 2010, all the nurses continued to submerge his medication in "dirty water" and no one appeared to be recording whether the pills were being taken. *Id*.

Plaintiff also states that his the cuffs on his Canadian crutches had deteriorated so badly that the metal was cutting into his arms. New crutches were ordered by staff at RCI on July 21, 2010. Although he was reassured by ECI staff that the crutches would arrive by the end of August, they still had not arrived by August 24, 2010. ECF No. 17 at p. 5.

**Standard of Review**

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an

5

> otherwise properly supported motion for summary judgment; the
> requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## Analysis

It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir.2004) (no respondeat superior liability under § 1983); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir.2001) (no respondeat superior liability in a Bivens suit). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.' " *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir.2001) *citing Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir.1984). Supervisory liability under § 1983 must be supported with evidence that: (1) the

supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.1994).

Plaintiff has pointed to no action or inaction on the part of Defendants Wexford & Associates, Warden Morgan and Warden Green that resulted in a constitutional injury. [4] Wexford's Motion for Summary Judgment makes clear its role in the provision of medical care is limited to review of requested services received from medical care personnel; Wexford's role is not a proactive one. To the extent any requested service for Plaintiff was denied by Wexford, the denial was based on objective medical criteria which did not indicate a need for the test requested. Plaintiff does not have a constitutional right to unlimited medical care.

Morgan and Green are not responsible for the delivery of medical care to prisoners. Absent evidence that they somehow interfered in medically required care, Morgan and Green are not liable for the alleged failure to provide constitutionally adequate medical care.[5] Accordingly,

---

[4] In his Opposition Plaintiff asserts that Wexford did not provide complete medical records with its Motion for Summary Judgment and concludes that Wexford interfered with care once prescribed. ECF No. 33 at p. 3. As an example of the interference Plaintiff cites his inability to take Neurontin that had been soaked in water by nursing staff. *Id*. Clearly, Wexford was not involved in the conduct alleged. Plaintiff also states Wexford denied a request submitted on December 30, 2010, to have his gallstones surgically removed and to have an MRI performed on his lower back. *Id*. at p. 4. All evidence submitted suggests there was never a request for surgery or an MRI as alleged. ECF No. 29, Ex. B, pp. 2—7. Indeed Wexford approved a consultation request for a hepatobiliary iminodiacetic acid (HIDA) scan to assess Plaintiff's gallbladder and liver. The test was performed on March 23, 2007. *Id*.

[5] Plaintiff argues that Green and Morgan should be held liable because they blocked his access to courts by stopping his outgoing mail in retaliation for his complaints. ECF No. 35. Plaintiff offers no evidence that he suffered harm as a result of the alleged retaliation. Bald assertions of retaliation are subject to dismissal. *See Lewis v. Casey*, 518 U.S. 343, 349 (1996) (requiring actual injury). His further claims regarding Green's knowledge that the water in the prison was contaminated is not raised in the complaint and is not founded on any objective factual allegations. ECF No. 35. Plaintiff offers only a speculative theory that drinking the water gave him gastro-esophageal reflux disease. *Id*. The claim will be dismissed.

Plaintiff's claims against these Defendants shall be dismissed. The merits of the claims raised against the remaining Defendants, who are medical care providers, are addressed below.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) *citing Wilson v. Seiter*, 501 U.S.294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, Plaintiff must demonstrate that the actions of Defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, Plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839– 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted

punishment.'" *Brice v. Virgiinia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) *quoting Farmer* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted. *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000); *citing Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

Plaintiff's complaints concern rectal bleeding, abdominal pain, gallstones, hip and sciatic nerve pain, and delivery of medications as well as assistive devices. Plaintiff also raises a claim concerning the use of restraints and the apparent abandonment of medical orders prohibiting their use when he is using crutches. Each claim is addressed below.

Plaintiff was evaluated for complaints of rectal bleeding by Dr. Mathis on April 10, 2007. ECF No. 29 at Ex. A, p. 2. At that time Mathis noted that Plaintiff had previous normal stool specimens and that the abnormal abdominal pains he experienced were due to the BSS. *Id*. at p. 3. Plaintiff was prescribed a laxative. Plaintiff then requested an MRI, CT scan, or colonoscopy because he was concerned that he had cancer. On May 1, 2007, Plaintiff expressed his concerns to Mathis and told him his father probably died of kidney cancer.[6] At that time Plaintiff claimed he was experiencing bleeding and pain in the rectum and testes. Mathis noted that Plaintiff's symptoms were due to a psychosomatic response to BSS. A request for further testing was made, but was not approved by Wexford. Plaintiff did not meet the criteria for a colonoscopy and it was decided that he should be monitored for weight loss, blood counts and hemoccults for signs of bleeding. *Id*. at pp. 3—4. Plaintiff had received a colonoscopy in 2000 and it revealed

---

[6] Mathis confirmed that Plaintiff's father is alive. ECF No. 29 at Ex. B, p. 22. Plaintiff counters that his stepfather, William E. Alton, Jr., is alive, but his biological father Larrics Russell, Sr., died from sepsis on or about July 7, 1992. ECF No. 35 at p. 2.

he had internal hemmorhoids, believed to be the cause of the rectal bleeding. ECF No. 29 at Ex. A, p. 4; Ex. B, pp. 29—37 and 42—43.

Plaintiff again approached medical staff for tests to determine if he had Crohn's disease, Barrett's esophagus, colon cancer, polyps, diverticulitis, irritable bowel syndrome, and GERD. Plaintiff was reminded by Mathis that he was already being treated for GERD. Mathis noted that Plaintiff was experiencing somatization[7] again and recommended a psychiatric consult with Dr. Juan de la Torre. ECF No. 29 at Ex. A, p. 4; Ex. B, p. 24.

In February 2008, Plaintiff again complained about rectal bleeding and blood in his stool. He was given a rectal exam which proved positive for blood in the stool. Plaintiff was referred for a CT scan of his abdomen and prescribed stool softeners and laxatives to prevent irritation of internal hemmorhoids. *Id*. at Ex. A, pp. 4—5. On May 13, 2008, the CT scan was performed and revealed that Plaintiff has an umbilical hernia. No other significant conditions were found. *Id*. at Ex. B, pp. 29—37; 42—43.

On July 25, 2009, Plaintiff again complained of rectal bleeding when he submitted a sick call slip stating he wanted to be tested for an ulcer in his anal area and for prostate cancer. When evaluated on July 28, 2009, Plaintiff asked if there was a screening test for inflammation, rectal ulcers, and prostate cancer. ECF No. 29 at Ex. A, p. 5. Plaintiff related that his father had died from sepsis. He was told that periodic screening for the prostate is available, but screening tests for the other concerns are not. *Id*. at Ex. B, pp. 110-112, 115.

Plaintiff's concerns regarding rectal bleeding were addressed. His every request was not granted, but Defendants are not required to provide Plaintiff with diagnostic tests that are not

---

[7] Somatization disorder is a chronic, severe psychiatric disorder characterized by many recurring clinically significant physical complaints (including pain and GI, sexual, and neurologic symptoms) that cannot be explained fully by a physical disorder. *See Merck Manual*, 17th Ed., at pp. 1508-9.

10

indicated by the symptomology observed. There is no Eighth Amendment violation where diagnostic tests are declined based on medical assessments of the patient. *See Wright v. Collins*, 766 F.2d 841, 849(4th Cir.1985) (disagreement with medical opinion is not deliberate indifference).

Plaintiff's complaints concerning abdominal pain center around two conditions: a hernia and gallstones. Plaintiff's hernia was assessed and found to be easily reducible and consisting of fatty tissue; a binder was ordered for him to wear. A hepatobiliary iminodiacetic acid (HIDA) scan was performed on March 23, 2007, which showed "no evidence of acute cholecystitis." *Id*. at p. 4. On May 13, 2008, Plaintiff was given a CT scan which showed a "small ventral hernia containting fat just above the umbilicus;" and normal spleen, adrenal gland, kidneys, bladder, prostate and bowel. ECF No. 18 at Ex. 4, p. 2.. The scan also showed "calculi in the gallbladder" and a follow up CT exam was recommended. *Id*. Another CT scan was done on March 2, 2009, to assess Plaintiff's complaints of abdominal pain. *Id*. at Ex. 5, p. 2. The test results showed normal pancreas, spleen, kidneys, and bowel. A gallstone was detected in the gallbladder. *Id*.

Based on the CT scans, Plaintiff's complaints concerning rectal bleeding and abdominal pain were attributed to internal hemmorhoids and BSS, respectively. ECF No. 29 at Ex. B, p. 9. On November 24, 2009, another HIDA scan was requested even though it was noted that Plaintiff's symptoms were related more to GERD than to gallstones. *Id*. at p. 118. Notwithstanding the test results, Plaintiff continued to insist on obtaining a CT scan, MRI and Barium swallow tests because he was convinced he had a serious illness that was not being addressed. *Id*. at pp. 13 and 24. In his response to summary judgment Plaintiff asserts that the failure to provide him with gall bladder surgery is deliberate indifference to a serious medical

11

need. ECF No. 33 at p. 6. The evidence submitted by Defendants, however, indicates that Plaintiff's complaints regarding abdominal pain were taken seriously, he was provided with appropriate diagnostic tests, and it was determined through those tests that Plaintiff does not have acute cholecystits requiring surgery. Defendants have not exhibited a callous disregard for a serious medical need with respect to the claims concerning abdominal pain and gallstones.

Plaintiff's claim regarding hip and sciatic pain is that a prescription was written for sacroiliac injections, but were never received. ECF No. 1. Plaintiff states P.A. Kevin McDonald at RCI recommended an injection for chronic hip pain and sciatic nerve damage stemming from a lower back/disk injury on August 6, 2010. ECF No. 33 at Ex. 19. On September 5, 2010, after Plaintiff was transferred to ECI, he filed an ARP concerning the failure to provide the injection. *Id.* He was informed that:

> [A]lthough you did not receive the injection at the previous facility, upon your arrival at ECI the order was only active for an additional two days. You were reevaluated by a provider at this facility for your pain and it was determined that the injection would have no value in treating your pain and the order was not renewed.

*Id.* Defendants assert that an x-ray of Plaintiff's lumbar spine was taken on August 31, 2010, and it showed a "large defect in the pars interarticularis between the fourth and fifth lumbar vertebrae, but an otherwise unremarkable study." ECF No. 29 at Ex. A, p. 14; Ex. B, pp. 149 - 55. The "pars interarticularis" is a special region of the bony roof of the spinal canal between the upper and lower flat projections on the surfaces of the arches of the vertebrae on either side. *Id.* at Ex. A, p. 14. Defendants explain that most patients with this defect have excellent outcomes with conservative treatment such as physical therapy and that surgery is rarely necessary. *Id.* Although Defendants assert there is no record of a recommendation for cortisone injections, Plaintiff has provided sufficient evidence that such a recommendation was made. ECF No. 33 at

Ex. 19. Notwithstanding that recommendation, however, the failure to provide the cortisone injection is not deliberate indifference to a serious medical need where, as here, a conservative treatment approach is adopted instead. Plaintiff was given physical therapy for treatment of his back pain. ECF No. 29 at Ex. B, pp. 149 -55. A conservative medical approach is not equivalent to callous disregard.

With respect to providing Plaintiff with devices to assist with ambulation and providing other medical orders to address his disability, the record evidence establishes that Plaintiff's needs were not ignored and he has suffered no identifiable injury as a result of any delays in providing devices. Plaintiff's claim that custody staff ignored a medical order requiring him to be cuffed in front references one occurrence. ECF No. 1. The medical order, written June 13, 2007, along with a recommendation that Plaintiff be allowed to take a shower before other inmates were permitted into the shower area, was not rescinded. ECF No. 29 at Ex. A, pp. 7 - 8; Ex. B, pp. 17 - 18. Rather, when it was later noted that Plaintiff had a tendency to fall when he was handcuffed and using crutches, a new order was written by Dr. Mickel to permit the use of a wheelchair when he is restrained. *Id*. at Ex. A, p. 13; Ex. B, pp. 129 - 30. Plaintiff was also permitted to use the wheelchair for work and for moving longer distances.[8] The permanent use of a wheelchair was, however, discouraged so that Plaintiff would continue to walk and get exercise. *Id*.

For his lower back pain, Plaintiff was given an x-ray, physical therapy, and anti-inflammatory medication. Additionally, Plaintiff was provided with a wheelchair and a back

---

[8] Plaintiff did not agree with the requirement of using a wheelchair while he was working in the kitchen area and filed a lawsuit in this court regarding that order. *See Alton,* Civ. Action WMN-10-1812 (D. Md.). Dr. Ottey evaluated Plaintiff on April 24, 2010, and wrote an order allowing him to work without the use of his wheelchair. ECF No. 29 at Ex. B, pp. 137 - 38.

brace. When he returned to medical staff with a request for an MRI it was noted that his back pain was improving and an MRI was not indicated.

Plaintiff complained that his crutches were falling apart and cutting into his arms. ECF No. 1. On July 2, 2010, Plaintiff submitted a sick call slip requesting a repair to his crutches or replacement. ECF No. 33 at Ex. 26. Medical staff noted that the crutches were falling apart and needed to be replaced. In the interim, tape was put on the cuff of the crutches to keep them from hurting Plaintiff's arms. A new pair of crutches was ordered. *Id*. Although it took approximately 4 months to receive the new crutches, the delay was not due to a refusal to order the crutches. There is no evidence that the delay was caused by a callous disregard for Plaintiff's medical needs and Defendants are entitled to summary judgment on this claim.

Plaintiff's claim regarding the delivery of his medication concerns a practice in place at ECI of "floating" medications provided at pill call. ECF No. 1. Plaintiff claims the practice of soaking his prescribed Neurontin renders the medication unpalatable and frequently results in missed doses. *Id*. None of the Defendants address this claim; rather, they assert simply that Plaintiff "often refuses to take his Neurontin." ECF No. 29 at Ex. A, p. 15. The only documentation provided regarding the policy is provided by Plaintiff. ECF No. 33. When he filed an ARP concerning the process the following response was provided:

> It is the policy of your facility to float all medications for all inmates during pill call. This has been reviewed and approved by the pharmacy, ECI Administration, and the Medical Department as an approved method of medication administration.

*Id.* at Ex. 18, p. 2. In response to another ARP filed concerning the same policy, Plaintiff was told that Neurontin is not approved as a "KOP" medication and that he is receiving the maximum dose. *Id*. at p. 3. Plaintiff asserts he was permitted to keep the medication with him at RCI and that it was only at ECI that his medication was delivered to him in this manner. The purpose of

the Neurontin prescription was to address Plaintiff's pain. There is no explanation regarding the policy in place at ECI, and whether any exceptions are made when the policy interferes with the delivery of prescribed medications. Notwithstanding that oversight, there is no allegation that the policy resulted in an increase in Plaintiff's pain. Plaintiff's chief complaint is that the water used to float the medication is contaminated, causing him to become nauseous and giving him GERD. ECF No. 17 at p. 4. The court notes, however, that Plaintiff's treatment for GERD pre-dates his confinement at ECI. ECF No. 1 at p. 8; ECF No. 29 at Ex. A, p. 5. Additionally, his allegations concerning the water quality at ECI are not based on any objective factual observations. Plaintiff simply speculates that Warden Green does not drink the water and concludes the water is making him sick. ECF No. 33 and 35. While there may be cause for concern regarding the policy of "floating medications" in a case where an actual injury (e.g., exacerbation of a serious medical condition) is alleged, the instant claim is not such a case. *See De'Lonta v. Angelone,* 330 F.3d 630, 635 (4th Cir. 2003) (abrupt cessation of hormone therapy causing exacerbation of self-harm episodes).

## Conclusion

In granting summary judgment to Defendants the court in no way implies that Plaintiff is not entitled to medical treatment for his serious condition. The right to treatment, however, is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir.1977). The record evidence indicates that Plaintiff's requests are considered and his needs are addressed. The fact that every request for medical tests are not approved does not reflect deliberate indifference. The delays that have occurred do not appear to be deliberate, nor have they resulted in harm to Plaintiff. To the

extent some of Plaintiff's many complaints have gone unaddressed, "an inadvertent failure to provide adequate medical care does not amount to deliberate indifference." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). Plaintiff's numerous grievances with the medical decisions made regarding what tests and treatments are necessary in light of the symptoms presented are reflective of his frustration, but "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849(4th Cir.1985), *citing Gittlemacker v. Prasse,* 428 F.2d 1, 6 (3rd Cir.1970). There are no exceptional circumstances alleged in this case.

Accordingly, by separate Order which follows, Defendants' Motions for Summary Judgment shall be granted.

/s/

  4/18/11  
Date

William M. Nickerson  
Senior United States District Judge